UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

RALPH A. VANZANT, et al.                    CASE NO. 1:04cv484

        Plaintiffs                    Judge Barrett

    -vs-

DAIMLER CHRYSLER
CORPORATION,

        Defendant.

**OPINION AND ORDER**

Defendant, Daimler Chrysler Corporation, has moved for summary judgment (Doc. 47) on Plaintiffs' complaint. Plaintiff filed a memorandum in opposition (Doc. 49) and Defendant replied (Doc. 52).

I.    BACKGROUND INFORMATION AND FACTS

Plaintiffs' complaint alleges negligence (Count I); strict products liability defect in design and/or manufacture (Count II); strict liability - failure to warn (Count III); breach of expressed warranty (Count IV); breach of implied warranty (Count V); punitive damages (Count VI); and loss of consortium (Count VII). Plaintiffs indicate in their memorandum in opposition that they are withdrawing their manufacturing defect claim (part of Count II) as well as Counts III and IV.

    A.    The Accident.

On February 18, 2002 at approximately 8:55 A.M., Plaintiff, Ralph Vanzant and his friend, David Cornelius, were traveling in a 1998 Dodge Ram 1500 pick-up truck (hereinafter "Dodge Ram") in a southeast direction on State Route 73 in Highland County,

Ohio. (Police Report attached as Exhibit 1 to Doc. 47). Mr. Cornelius was driving with Mr. Vanzant riding in the front passenger seat. As they approached the intersection of State Route 73 and Prospect Road, traveling at approximately 50 miles an hour, a 1985 Chevy pick-up truck, traveling westbound on Prospect Road attempted to cross State Route 73 in front of them, resulting in a collision between the Chevy and the Dodge Ram. (Doc. 47, Exhibit 1).

According to Plaintiffs, at the time of impact the Dodge Ram was traveling 32 to 33 mph and the offending Chevy pick-up truck was traveling 11 to 12 mph. The impact between the vehicles slowed the speed of the Dodge Ram by 11 ½ mph. (Doc. 49, Exhibit 1, Aerni Depo., Pgs. 172-173)[1]. The Chevy continued to travel across the intersection and struck a third vehicle before stopping. The driver of the Chevy pick-up truck was at fault and was cited for failure to yield causing the accident. (Doc. 47, Exhibit 1).

Plaintiff Ralph Vanzant was not wearing a seatbelt and sustained a cervical spine injury while his passenger, David Cornelius, who was likewise not wearing a seatbelt did not require any medical treatment. (Cornelius Depo. Pg. 69; Vanzant Depo. Pg. 49-50; Doc. 47, Exhibit1). Mr. Vanzant had to be cut out of the vehicle and was heli-lifted to Miami Valley Hospital for treatment. (Doc. 47, Exhibit 4). At the time of the accident, Plaintiff was approximately 6' tall and weighed 260 pounds. (Vanzant Depo., Pgs. 95-96). Also at the time of the accident, Mr. Vanzant apparently suffered from an undiagnosed spinal stenosis. (Benedict Depo., Pg. 90; Pirnat Depo., Pg. 47). As a result of the accident, Plaintiff

---

[1] Only deposition excerpts were filed in this matter as exhibits to the pleadings. The remaining references will be to just the deposition transcript without reference to the document number and exhibit number that the excerpt is attached to.

sustained an injury to his cervical cord rendering Plaintiff a quadriplegic. (Benedict Depo., Pg. 63; Pirnat Depo., Pg. 13).

    B.    The Airbag.

The passenger side airbag of a Dodge 1998 Ram truck is a mid-mount design which means that its deployment doors are located on a portion of the instrument panel facing the occupant rather than on top of the instrument panel facing the windshield. (Doc. 47, Exhibit 10 at 1). Defendants have attached photographic test results on airbag deployment using an unbelted dummy in the 95th percentile (i.e., a similar size to that of Plaintiff) with the passenger moved six inches forward in the seat. (Doc. 47, Exhibit 21). These deployment photographs show the airbag strike the dummy's lower torso first and, in the pictures provided, does not reach the dummy's forehead. From an analysis of the deployment airbag and observation of films, Defendant's expert opined that the airbag in question comes virtually straight out horizontally towards the passenger's chest. (Brantman Depo., Pg. 83). The full pattern of the airbag is designed to deploy downward if there is an object, like an out of position unbelted passenger, blocking the bag. (Id. at 214). A mid-mount airbag can usually use a lower pressure inflator and have a smaller bag volume to work with. According to Defense experts, very little of the bag will get up into the neck area from the mid-mount. The inflator in the 1998 Dodge Ram is a hybrid inflator which is a combination of stored gas and a pyrotechnic generator that heats up the gas which results in one of the lowest power inflators that Brantman has seen. (Id. at 141).

    II.    <u>ARGUMENTS</u>

The Plaintiffs' argue that Ralph Vanzant's head came into contact with the airbag, specifically, the leading edge of the airbag, during the accident thus causing the injury.

Plaintiffs argue that the airbag was too forceful and that Chrysler's design is lacking as it ignores the issue of foreseeable misuse wherein approximately 40% of passengers in pick-up trucks are unbelted. Plaintiffs contend that the Defendant did not adequately test for pre-impact breaking on unbelted passengers.

Defendant counters that Plaintiff's primary initial theory, that the airbag was too powerful, is not sustainable based upon the evidence presented. They further assert the expert opinions and testimony submitted by the Plaintiffs have no foundation in the factual record and, in fact, is contradicted by it.

### III.   LEGAL ANALYSIS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986). The moving party bears the initial burden of showing the absence of a genuine issue of material fact, but then the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita*, 475 U.S. at 587. However, the nonmoving party may not rest on the mere allegations in the pleadings. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex*

*Corp. v. Catrett, supra* at 322. Once the movant has met this initial burden, the non-movant cannot rest on its pleadings, but must show that there is a genuine issue for trial. *Id.* at 324. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247-48 (1986)(emphasis original). Thus, the Supreme Court has stated that "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]" *Id*. at 252. Consequently, if the evidence presented by the non-moving party is not significantly probative, summary judgment is properly granted. *Id*. at 249-250.

Defendant has also filed a separate motion to strike the Affidavit of Byron Bloch (Doc. 53) which has been granted, in part, and denied, in part. Defendant's motion regarding Bloch deals with the admissibility of certain portions of his Affidavit submitted by Plaintiff in response to Defendants' Motion for Summary Judgment. "The issue of the admissibility of an expert's [testimony] is distinct from the issue of whether the [testimony] is sufficient to withstand a summary judgment motion" and requires separate inquiries regarding the admissibility of the experts' affidavit and the sufficiency of the affidavit to withstand summary judgment. *Monks v. General Electric Co.*, 919 F.2d 1189, 1192-93 (6th Cir. 1990). Federal Rule of Evidence 703 states, in part, that

> the facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in

>forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. . .

However, where the record taken as a whole cannot lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Monks, supra*. A party may not create a factual issue by filing an affidavit after a motion for summary judgment has been filed which contradicts his earlier deposition testimony. If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. *Reid, et al. v. Sears Roebuck & Company*, 790 F.2d 453 (6th Cir. 1986). Numerous courts have held that Rule 56 does not "make summary judgment impossible whenever a party has produced an expert to support its position." *Merit Motors v. Chrysler Corp., et al.*, 569 F.2d 666, 673 (D.C. Cir. 1977).

Defendant states that "[t]he nub of [its] motion is whether summary judgment is proper when the non-movant submits expert testimony that has no foundation in - and indeed is contradicted by - the factual record in the case." (Doc. 47, Pg. 7).

  A. Strict Products Liability Defect in Design.

The law on products liability is codified in Ohio Revised Code Chapter 2307 which states that "a manufacturer is subject to liability for compensatory damages based on a product liability claim only if the claimant establishes, by a preponderance of the evidence, both of the following: (1)... the product in question was ...defective in design or formulation as described in 2307.75 of the Revised Code...; [and] (2) A defective aspect of the product in question ... was a proximate cause of harm for which the claimant seeks to recover

compensatory damages." O.R.C. §2307.73.

Ohio Revised Code Section 2307.75[2] provides, in relevant part, the following:

(A) Subject to divisions ... (F) of this section, a product is defective in design or formulation if either of the following applies:

(1) When it left the control of its manufacturer, the foreseeable risks associated with its design or formulation as determined pursuant to division (B) of this section exceeded the benefits associated with that design or formulation as determined pursuant to division (C) of this section;

(2) It is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

(B) The foreseeable risks associated with the design or formulation of a product shall be determined by considering factors including, but not limited to, the following:

(1) The nature and magnitude of the risks of harm associated with that design or formulation in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;

(2) The likely awareness of product users, whether based on warnings, general knowledge, or otherwise, of those risks of harm;

(3) The likelihood that that design or formulation would cause harm in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;

(4) The extent to which that design or formulation conformed to any applicable public or private product standard that was in effect when the product left the control of its manufacturer.

(C) The benefits associated with the design or formulation of a product shall be determined by considering factors including, but not limited to, the following:

(1) The intended or actual utility of the product, including any performance

---

[2] Ohio Revised Code Section 2307.75 was amended by 150 v S 80, § 1, eff. 4-7-05. Since this case was filed in 2004 the 2001 version of the statute is applicable since Congress did not speak to retroactivity and because substantive changes were made. It is noted, however, that the motion for summary judgment was filed after the revised version became effective.

or safety advantages associated with that design or formulation;

(2) The technical and economic feasibility, when the product left the control of its manufacturer, of using an alternative design or formulation;

(3) The nature and magnitude of any foreseeable risks associated with such an alternative design or formulation.

Product defects may be proven by direct or circumstantial evidence. Where direct evidence is unavailable, a defect in a manufactured product existing at the time the product left the manufacturer may be proven by circumstantial evidence or other competent evidence where a preponderance of that evidence establishes that the product was defective in design or formulation. O.R.C. §2307.73(B).

       1.     Feasible Alternative Design.

The risk-benefit test stated above is subject to O.R.C. §2307.75(F) which states that "A product is not defective in design or formulation if, at the time the product left the control of its manufacturer, a practical and technically feasible alternative design or formulation was not available that would have prevented the harm for which the claimant seeks to recover compensatory damages without substantially impairing the usefulness or intended purpose of the product, unless the manufacturer acted unreasonably in introducing the product into trade or commerce."

The Court must first consider O.R.C. 2307.75(F) to determine if a practical and technically feasible alternative design was available for the 1998 Dodge Ram.[3] "The subsection does not state whether the plaintiff or defendant bears the burden of production of an alternative design." *McGrath v. General Motors Corporation*, 26 Fed. Appx. 506 (6th

---

[3] It is undisputed that the defect in the airbag, if any, existed at the time it left the control of DaimlerChrysler.

Cir. 2002, unpublished). However, case law has determined that plaintiffs bear the burden of production. *See McGrath, supra; Jacobs v. E.I. du Pont de Nemours & Co.,* 67 F.3d 1219, 1242 (6th Cir. 1995).

Plaintiffs, through their expert, Byron Bloch, argue that there are several practical and technically feasible alternative designs for the airbag that were available. First, Mr. Bloch opines that had the airbag had a dual-stage or sequential inflator that the airbag would have inflated less forcefully and not injured Mr. Vanzant in such a devastating manner. (Doc. 52, Exhibit 1, Pgs. 3-4). Defendants argue that this opinion is based on the fact that Mr. Bloch thinks the airbag was too forceful for the moderate severity of the collision (Id. at 4) and that this opinion is not supported by the evidence as it has been shown that the airbag was, in fact, not too forceful.

Mr. Bloch opines that a peak pressure of 250 to 300 pounds to the occupant would be his preference for the vehicle and that he did not know the actual force with which the airbag in question actually deployed. Dr. Allen estimated the force of the airbag at 500 pounds but conceded that he did not know the mass of the 1998 Dodge passenger airbag (Allen Depo., Pg. 28, 78). He further conceded that his calculation of force is "certainly not applicable to the specifics of the Dodge Ram" as he based his calculation on a generic 1992 powered airbag (Allen Depo., Pgs. 184-86. See also Pgs. 28-29). In making his assumptions, Dr. Allen based the overall mass of the airbag at 5.5 pounds. (Allen Depo. Pg. 79-80). Dr. Brantman indicated the mass of the passenger side airbag for the Dodge Ram was only 1.39 pounds, significantly less than the 5.5 pounds assumed by Dr. Allen. (Brantman Depo. Pg. 208)(See also Doc. 47, Exhibit 18). Thus, he concluded, since force equals mass times acceleration and the mass is four times lower than assumed by Dr.

Page 9 of 18

Allen, then the force will be four times lower as well. So based on the formula Dr. Allen used, his calculation of 500 pounds would now be four times lower, which would be 125 pounds and well below the acceptable range of 250-300 pounds preferred by Mr. Bloch. (Id. at 208-209). Therefore, the alternative of using multiple or sequential inflation pressures to make the airbag deploy with less force is not a viable alternative since it has been shown that the air was, in fact, well below the acceptable range of Plaintiff's expert.

Next, Mr. Bloch opines that the Defendant should have utilized tethers and airbag folding patterns to help shape the bag and reduce the distance that the airbag inflates from its stowed position. (Doc. 52, Exhibit 1, Pg. 4). Mr. Bloch asserts that untethered airbags can generate a force of 2,000 pounds and can deploy up to 20 to 25 inches from the instrument panel compared to tethered bags which only deploy 14 to 18 inches from the instrument panel. However, it has been shown that the specific airbag at issue in this accident only generated 125 pounds of force and Mr. Bloch failed to state how far *this* airbag deployed. Additionally, Defendant, in its reply brief, counters that the tethers add additional mass to the airbag creating a greater force and becoming more dangerous to passengers. Thus, Plaintiffs have not shown sufficient proof that the use of tethers is a feasible alternative design.

Mr. Bloch also opines that the folding patterns can affect how the airbag unfolds which can lead to an increased potential for a hyper-extension type injury as the torso proceeds into the inflating bag while the head is simultaneously forced rearward. (Doc. 52, Exhibit 1, Pg. 4). Although the Defendant does not address the issue of folding patterns, Plaintiffs have failed to show what folding pattern was used in the 1998 Dodge Ram truck and failed to prove what specific alternative folding pattern would have been better.

Finally, Mr. Bloch opines that a "top-mount" design for the airbag is preferable to the mid-mount design that is used on the 1998 Dodge Ram because the initial inflation pressure of a top-mounted design is directed upwards toward the windshield as opposed to the mid-mount that directs the pressure horizontally towards the passenger. (Doc. 52, Exhibit 1, Pg. 4). Mr. Bloch states "the force of such a horizontally inflating airbag... can cause severe injuries." (Id.) Thus, Mr. Bloch opines that the mid-mount on the 1998 Dodge Ram pickup truck has an inflation path that "is mostly horizontal, directly toward the seated passenger, Ralph Vanzant. (Id.). Defendant again asserts that since it has been shown that the force generated by this airbag is less than the acceptable range of force preferred by Mr. Bloch that this theory is not support by the evidence. The Court disagrees. Mr. Bloch is of the opinion that a top-mount distributes the pressure differently than a mid-mount, more vertically to be precise. The horizontal pressure, even of this depowered airbag, may, in fact, still be greater than that of a top-mount. Furthermore, although it is hotly disputed as to what Mr. Vanzant hit his head on or what hit him, it is undisputed that he did, in deed, hit his head on something or that something hit his head and caused his severe injury. Thus, the Court finds that Plaintiffs have sufficiently proved, to survive this motion, that a top-mounted airbag may be a practical and technically feasible alternative design that would have prevented the injures for which Plaintiffs are seeking to recover without substantially impairing the usefulness or intended purpose of the airbag.

    2.    Risk v. Benefits

The Court must next consider if the foreseeable risks associated with the design of the airbag exceed the benefits. As set forth above, there are several factors to be

considered. See O.R.C. §2307.75(B) and (C). Unfortunately, the briefs submitted by the parties do not specifically address these factors. Instead, Plaintiffs allege that the Defendant did not adequately test for "foreseeable misuse" - that 40% of drivers and passengers do not wear seatbelts. However, this alone does not show how the foreseeable risks exceed the benefits. Thus, Plaintiffs have failed to prove that there is a genuine issue of fact on this issue.

### 3. Consumer Expectation

A product is defective under Ohio law if it is more dangerous than an ordinary consumer would expect. O.R.C. §2307.75(A)(2). Moreover, "the determination of whether a product is more dangerous than an ordinary person would expect is generally a question of fact which does not require expert testimony." *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 455 (6th Cir. 2000) *(citing Fisher v. Ford Motor Co.*, 13 F. Supp. 2d 631, 638 n.10 (N.D. Ohio 1998). However, there is no evidence in the record to indicate what an ordinary consumer would expect from an airbag during this type of accident. The only testimony relative to customer expectation is that from Plaintiff's expert. Mr. Bloch states that "airbags were designed and tested to offer adequate protection in frontal collisions *for both the unbelted and belted drivers and passengers."* (Exhibit 52, Exhibit 1, Pg. 2 (emphasis added)). This statement, however, is not sufficient to survive summary judgment. Furthermore, Mr. Vanzant did testify that he was aware of the seatbelt warning that says "death or serious injury can occur." (Vanzant Depo. Pg. 78).

### 4. Proximate Cause

Based upon the above decisions of this Court, the Court need not consider proximate cause. However, if Plaintiffs had established the risk-benefit theory of design

defect or the consumer-expectation standard above, the question of proximate cause would be one for a jury.

Mr. Vanzant suffered a hyperextension injury. This type of injury can be caused by the body moving forward and the head moving back or the head being abruptly stopped as the body continues to move forward. (Pirnat Depo., Pg 13). Plaintiff's expert, Dr. Pirnat concluded that based upon his review of the medical charts and the emergency room doctor's report that Mr. Vanzant was hit in the forehead by the airbag (Pirnat Depo., Pg. 37). Dr. Pirnat's statement is consistent with Mr. Vanzant's own testimony wherein he stated that he was hit in the head and face. (Vanzant Depo., Pgs. 97, 118).

Defendant's experts opine to the contrary. Dr. Brantman states that there is no position in which Mr. Vanzant could have been seated that would bring his head down to a level where an airbag could cause a forehead injury without totally abrading his face. (Brantman Depo., Pg. 61). More stridently he says, "you could not get an isolated abrasion on the forehead in any type of out of position scenario I'm looking at from that airbag. You would have to have associated other injuries, particularly abrasions, that would have occurred." (Id.). Dr. Benedict further indicates that the abrasions on the left side Mr. Vanzant's forehead could have been caused by the header or the sun visor. (Benedict Depo., Pgs. 62-63).

The record on this issue is muddy to say the least. Plaintiffs experts as well as Mr. Vanzant have all stated that the airbag hit Plaintiff's head causing his injuries. However, in response to questions posed by Defendant at their depositions, Dr. Pirnat and Dr. Allen seem to waiver on their opinions. Dr. Pirnat stated that it is possible that he could have received a hyperextension injury from striking the headliner, "A" pillar, or the windshield or

that he could have received these injuries in spite of the airbag. (Id. at 30). Dr. Allen stated that Mr. Vanzant could have received his injuries from striking the headliner. (Allen Depo. Pgs 65). Mr. Bloch states that his opinion is based on the review of Dr. Pirnat's deposition and the report of Dr. Allen. Mr. Vanzant testified that the airbag hit him "mostly in my head." However, when pressed further as to what part of his head, he stated "I had a cut or abrasion on my forehead, *I'm told*, so *I think* it was an upper part of my head it hit." (Vanzant Depo. Pg. 97 (emphasis added)).

Additionally, Dr. Pirnat concedes that he would have expected that an airbag deployed straight out into the chest with enough force to drive an individual's head backward would have left abrasions on the individual's face, chin, ears, lips or neck. (Pirnat Depo. Pg. 32). It is undisputed that the mid-mount airbag deploys straight out (or virtually straight out with a 12 degree upward movement) and that the only abrasions on Mr. Vanzant were those on his forehead. Dr. Pirnat further indicated he believed that the ER doctor noted a forehead abrasion specifically related to an airbag. (Id. at 33-34). However, the Court's review of the document (Doc. 49, Exhibit 4) notes only the abrasion without an indication of causation. Dr. Pirnat also testified that he knows nothing about the Dodge Ram airbag system, the force of the crash, or the position of Plaintiff prior to or during the crash. He even states that had the airbag not deployed, death was a real possibility and that Mr. Vanzant could likely have been killed in this accident. (Pirnat Depo. Pg. 31).

Dr. Allen also testified that he does not have any product design and analysis experience related to airbags and that he had never testified in case involving an automobile accident. (Allen Depo. Pgs. 11-12, 18). He also testified that he has never

Page 14 of 18

seen a documented study where there has been somebody who has received a paralyzing injury from an airbag due to a focal contact to the forehead as allegedly occurred here. (Id. at 70). When asked if he had a representation of the position that Mr. Vanzant had to be in order to receive the injury he did, Dr. Allen stated that "[o]nly to the extent that his head, wherever his body position was at the time, would have had to have been close to a leading edge of the airbag. That's the only thing we can say about it, if the scenario that the airbag caused the abrasion is true." (Id. at 73-74).

Additionally, Mr. Vanzant testified that he only moved forward a matter of inches right at impact and that he felt hit by the airbag exactly at impact. (Id. at 96-97). When asked if he was moving forward like if he was braking moving forward, he responded, "No, I don't recall that that was the case." (Id. at 97). Based upon this testimony, Defendant performed another crash test with an unbelted passenger of like size to Mr. Vanzant. See Doc. 47, Exhibit 21.[4] These deployment photographs show the airbag strike the dummy's lower torso first and in the pictures provided does not reach the dummy's forehead.

Plaintiffs also argue that Defendant's own employees help support Plaintiffs' claims. Guy Nusholtz, a Senior Manager for DaimlerChrysler, who devotes virtually all of his time to development and testing of airbag systems, testified that the crash tests performed involving unbelted passengers in front-end collisions at 30 and 35 mph do not show the

---

[4]The Defendant's further argue that a frontal crash test with a 1998 Dodge Ram shows that an unstrained driver in the 50th percentile, which is several inches shorter than Mr. Vanzant, strikes the windshield just below the headliner, hyperextending the dummy's head backwards in the precise manner in which Mr. Vanzant received his injury. See Doc. 47, Exhibit 22. However, this test shows an unrestrained driver and not a unrestrained passenger. Therefore, the test results at Exhibit 22 are not applicable here other than to show that the Defendant performed crash tests on an unstrained dummy.

dummy hitting the dashboard or windshield prior to contact with the airbag. (Nusholtz Depo. Pgs. 55-56). He went onto state that the dummy would not hit the dashboard or windshield at 50 mph either. (Id. at 57). Adelbert Timothy Czapp, another Senior Manager for DaimlerChrysler, agreed that pursuant to their crash test results, a deploying airbag can strike a passenger in the head and face area, depending on the location and movement of the passenger. (Czapp Depo. Pgs. 80-83). Thus, Plaintiffs conclude, Mr. Vanzant did not hit the dashboard or windshield, therefore, the airbag must have caused the injury. Defendant counters that Nusholtz testified that when a crash test dummy is positioned very close to the dashboard that the contact is just basically to the head but when the dummy is further back it contacts the dummy at the chest and head (Nusholtz Depo. Pg. 98) and that Czapp testified that the movement of the head as it strikes the airbag is forward and down, not back as alleged to have happened here, and that the head strikes the airbag not that the airbag strikes the head (Czapp Depo. Pg. 81-82).

As the Court views the facts in the light most favorable to Plaintiffs, the nonmoving parties, the Court would have found, based upon the conflicting evidence above, that there is a genuine issue of material fact in dispute that a jury must decide; however, as previously stated based upon the above rulings this issue is moot.

B. Negligence

Plaintiff's negligence claim requires proof of: (1) a duty to design against reasonably foreseeable hazards; (2) a breach of that duty; and (3) an injury that was proximately caused by the breach. *See McConnell v. Cosco, Inc.*, 238 F. Supp.2d 970, 980 (S.D. Ohio 2003)(*citing Briney v. Sears, Roebuck & Co.*, 782 F.2d 585, 587 (6th Cir. 1986)(applying Ohio law)). As previously stated, Mr. Bloch states that "airbags were designed and tested

to offer adequate protection in frontal collisions *for both the unbelted and belted drivers and passengers."* (Exhibit 52, Exhibit 1, Pg. 2). The Court takes judicial notice of the fact that car manufacturers have a duty to install airbags that meet stringent government standards[5] and a duty to design them against reasonably foreseeable hazards. See 49 U.S.C. § 30127; 49 CFR § 571.208, S4.1.5.3 (1998). The test for determining whether a particular hazard is foreseeable, is "whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Briney,* 782 F.2d at 588 *citing Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St. 3d 75, 77, 472 N.E.2d 707 (1984). It is clear to this Court that a reasonably prudent person would anticipate that an serious injury is likely to result when riding in a vehicle during an accident without wearing a seatbelt. See Doc. 49, Exhibit 9, Admission number 11 and 12.

The question now before the Court is whether that duty breached. This issue was also not addressed in the briefs and based upon the limited record before this Court, there is no evidence that it was. Thus, summary judgment must be granted.

C.  Breach of Implied Warranty

A breach of implied warranty claim is "virtually indistinguishable" from a design defect claim brought under the Ohio Products Liability Act. *Tompkin v. Phillip Morris USA, Inc.* 362 F. 3d 882, 902 (6th Cir. 2004). Thus, the breach of implied warranty claim will not be separately addressed in this Order.

D.  Loss of Consortium and Punitive Damages

Based upon the above, these claims can not survive.

---

[5]Plaintiffs do not argue that the Defendant failed to meet those stringent government standards. Thus, the Court assumes that the standards were met.

IV. <u>CONCLUSION</u>

Based upon the foregoing, Defendant's motion for summary judgment is hereby GRANTED. The Clerk of Courts is directed to remove this case from the docket of this court.

**IT IS SO ORDERED**.

<u>s/Michael R. Barrett</u>
Michael R. Barrett, Judge
United States District Court
